IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DION D. GIBBS, et al.,

    *Plaintiffs*,

    v.

JOHN CARNEY, CLAIRE DeMATTEIS, TRUMAN MEARS, DEPARTMENT OF CORRECTION, MONROE B. HUDSON, JR.

    *Defendants*.

No. 20-cv-01301-SB

---

Douglas D. Herrmann, James H.S. Levine, Kenneth A. Listwak, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware.

    *Counsel for Plaintiffs*.

Stacey Bonvetti, Daniel Christopher Mulveny, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware.

    *Counsel for Defendants*.

---

**MEMORANDUM OPINION**

BIBAS, *Circuit Judge*, sitting by designation.

When prisoners face threats to their health, the Eighth Amendment requires only that prison officials respond reasonably. And whether an official's response is reasonable depends on what that official knew about the threat.

Delaware prisoners say various officials were deliberately indifferent to the COVID-19 pandemic. But most of them responded reasonably: they mandated wearing masks, provided masks, quarantined sick prisoners, and screened visitors. Yet the warden did not. Though he allegedly knew that prison officers were flouting the mask mandate and punishing prisoners for making their own masks, he failed to intervene. So I dismiss all but one of the prisoners' claims.

## I. BACKGROUND

On this motion to dismiss, I take the complaint's well-pleaded factual allegations as true. In March 2020, prisoners at Delaware's Sussex Correctional Institute learned that COVID was dangerous. Am. Compl., D.I. 695 ¶¶ 32, 36. Worried, they asked for masks, more cleaning supplies, and better disinfecting procedures. *Id.* ¶¶ 37–38. At first, those requests were denied. *Id.* ¶ 39. So prisoners protested and made their own protective gear. One "fashioned and wore makeshift face masks out of a T-shirt and towel." *Id.* ¶ 48. He was fired from his job and consigned to solitary confinement. *Id.*

By April, Delaware had begun to respond. It ordered some employees to "stay home from work." *Id.* ¶ 49. And a month later, it mandated masks for staff, though some officers flouted the rule. *Id.* ¶¶ 50–54. It also placed Sussex on "lockdown." *Id.* ¶ 54. Plus, by July, Delaware had mandated masks for prisoners and begun testing particularly sick patients for COVID. *Id.* ¶¶ 57, 59. It eventually made tests available to all prisoners. *Id.* ¶ 68.

Still, the pandemic hit Sussex hard. Cramped conditions meant that prisoners could not socially distance. *Id.* ¶ 71(c). In one unit, more than half the prisoners contracted COVID. *Id.* ¶ 64. And at least two died. *Id.* ¶ 72.

To make matters worse, COVID tore through the prison's staff too. *Id.* ¶ 65. Nurses fell ill and missed shifts. So "sick calls backed up." *Id.* (internal quotation marks omitted). Some prisoners waited six weeks for treatment. *Id.* ¶ 66. Others with severe symptoms waited days to be taken to a hospital. *Id.* ¶ 71(g). And some prisoners were put on ventilators, then left unmonitored. *Id.* ¶ 71(f). Throughout it all, the prison kept charging prisoners $4 for each sick call. *Id.* ¶ 28.

Prisoners at Sussex say these conditions violated their state and federal rights to be free from cruel and unusual punishment. *Id.* ¶¶ 87–98. By failing to adequately respond to the pandemic, they say, Defendants were deliberately indifferent to COVID's danger. So they filed this class action against the Delaware Department of Correction, its Commissioners, the Sussex Warden, and the Governor of Delaware. They seek damages and injunctive relief. Defendants have moved to dismiss. D.I. 702.

So I ask whether the prisoners' "complaint … contain[s] sufficient factual matter, accepted as true, to state a [plausible] claim to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## II. THE ELEVENTH AMENDMENT BARS SOME OF THE PRISONERS' CLAIMS
### A. Claims against the Delaware Department of Correction

The prisoners cannot sue the state Department of Correction in federal court. A state is immune in federal court unless it waives its Eleventh Amendment immunity. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985), *abrogated on other grounds by statute*. Our test for finding a waiver is "stringent." *Id.* at 241. Thus, a state's "general waiver of sovereign immunity … is not enough to waive" its Eleventh

3

Amendment immunity. *Id.* Instead, the state "must specify [its] intention to subject itself to suit in *federal court.*" *Id.*

The prisoners point to a Delaware statute that waives sovereign immunity for claims against the state that are covered by insurance. Del. Code Ann. tit. 18, §6511. But that statute is only a "general waiver of sovereign immunity." *Atascadero*, 473 U.S. at 241. It does not suffice because it does not specifically waive Delaware's immunity in federal court. *See Ospina v. Dep't of Corr.*, 749 F. Supp. 572, 579 (D. Del. 1990); *Kardon v. Hall*, 406 F. Supp. 4, 8–9 (D. Del. 1975).

Delaware has not waived its Eleventh Amendment immunity. And the Department is "clearly a state agency." *Murphy v. Corr. Med. Servs., Inc.*, 2005 WL 2155226, at *2 (Del. Super. Ct. Aug. 19, 2005). So the prisoners cannot sue it. I thus dismiss their claims against the Department with prejudice.

### B. State constitutional claims

The prisoners also claim that the Defendants violated Delaware's Constitution. D.I. 695 ¶¶ 99–103. But the Eleventh Amendment bars state-law claims against state officials when "the relief sought … directly … [affects] the State itself." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). And the prisoners' requested relief would. They ask for "unlimited" masks, "long-term medical monitoring" and other improvements to Delaware's pandemic response. D.I. 695 ¶ 113. So I dismiss this claim with prejudice as well.

4

### III. MOST OF THE PRISONERS' REMAINING CLAIMS ALSO FAIL

That leaves only the prisoners' Eighth Amendment claim under 42 U.S.C. § 1983, seeking both damages and injunctive relief. They may not sue for damages. But their claim for injunctive relief survives—though only against Warden Mears.

**A. The prisoners may not sue the state officials for damages**

The prisoners cannot get damages under § 1983 because they sue the state officials in their official capacities. D.I. 695 ¶ 95. Section 1983 authorizes suits only against "persons." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). But "state officials acting in their official capacities are not 'persons' under § 1983." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996) (citing *Will*, 491 U.S. at 71). That is because such claims count "not [as] a suit against the official but rather [as] a suit against the official's office." *Will*, 491 U.S. at 71. So I dismiss with prejudice the prisoners' Eighth Amendment damages claim against the state officials in their official capacities.

**B. Only the prisoners' claim against Warden Mears survives**

Injunctions are another matter. When sued for injunctions, state officials count as persons under § 1983. *Will*, 491 U.S. at 71 n.10. So I turn to the merits.

To win, the prisoners must plausibly plead that each official was deliberately indifferent and that each was personally involved in that constitutional violation. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotation marks omitted). The only official who checks both boxes is Warden Mears.

5

**1. Apart from the warden, none of the officials was deliberately indifferent to COVID**

"The Constitution does not mandate comfortable prisons … but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). Thus, under the Eighth Amendment, prison officials must give prisoners "adequate … medical care." *Id.* But officials are liable for failing to do so only if: (1) prison conditions pose a "substantial risk of serious harm" to prisoners and (2) officials were deliberately indifferent to that risk. *Id.* at 834. Though the risk was serious and the officials knew of it, there is no plausible allegation that most of them deliberately disregarded it.

a. *Substantial risk of serious harm*. The prisoners meet the first, objective prong. *See, e.g.*, *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (holding that COVID satisfies the serious-harm prong). COVID threatened prisoners' health. Many fell ill. D.I. 695 ¶¶ 57–58, 64. Some needed IV fluids, CPR, or a ventilator. *Id.* ¶ 71. At least two prisoners died. *Id.* ¶ 72. So I turn to the second, subjective showing.

b. *Deliberate indifference*. The prisoners must also adequately plead the officials had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Since this is a prison-conditions case, they must satisfy this prong by pleading that the officials were "deliberate[ly] indifferen[t] to inmate health or safety." *Id.* (internal quotation marks omitted). This subjective prong requires two showings: (1) that each defendant *knew* that COVID posed a serious risk of harm and (2) that they disregarded "that risk by failing to take reasonable

6

measures" to address it. *Farmer*, 511 U.S. at 844, 847. Officials need ensure only "reasonable safety." *Id.* at 844 (internal quotation marks omitted). And they are not liable just because "the harm ultimately was not averted." *Id.*

The officials appear to concede the first sub-issue: they subjectively knew COVID was dangerous. Instead, they dispute the second. They say they did not disregard the risk COVID posed, but took reasonable measures to combat it. In support, they ask that I consider their publicly available COVID policies, and the prisoners do not object. I will do so. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (letting district courts consider "matters of public record" when deciding motions to dismiss).

Delaware began screening prisoners for COVID in January 2020. By April, it had started screening staff, isolating all incoming prisoners for 14 days, using new sanitizing machines, holding disinfection trainings, manufacturing masks, testing sick prisoners, and tracing infections. *How the Delaware Department of Correction Is Containing COVID-19* at 2–3 (June 3, 2020), https://doc.delaware.gov/assets/documents/How_the_Delaware_DOC_is_containing_COVID19.pdf. By June, half the prisoners had masks. *Id.* at 3. By December, the state was reviewing sick calls daily, triaging them, and following CDC quarantine guidelines. *COVID-19 Frequently Asked Questions*, at 1–2 (Dec. 2020), https://doc.delaware.gov/assets/documents/COVID-19_FAQ.pdf. It was also screening visitors for COVID and had given every prisoner two cloth masks. And by year's end, it had given nearly 10,000 COVID tests to staff and prisoners. *Id.* at 5–6.

By June 2021, the Department of Correction had mandated that each prison have its own "site specific infection/exposure control plan." *Policy of State of Delaware Department of Correction B-02*, at 2 (June 4, 2021), https://doc.delaware.gov/assets/documents/policies/policy_11-B-02.pdf. Each plan had to be reviewed and updated annually, and each had to meet certain minimum requirements. *Id.* For instance, each plan had to "follow the guidelines and recommendations of" the CDC, OSHA, and other prison-specific organizations. *Id.* And each had to mandate medical-grade masks in medical settings, vaccines for all consenting prisoners, and quarantine for sick prisoners. *Id.* at 3–6.

i. *Commissioner DeMatteis responded reasonably*. As the head of Delaware's Department of Correction, DeMatteis was responsible for the Department's "oversight [and] operation" until 2021. D.I. 695 ¶ 17 (citing Del. Code Ann. tit. 11, §§ 6516, 6517). Thus, she took part in many, if not all, of the Department's early COVID measures. Most of the prisoners' complaints stem from DeMatteis's tenure, especially the pandemic's first six months. But DeMatteis reasonably tried to protect prisoners from COVID. So she cannot be held liable. *See Farmer*, 511 U.S. at 845.

COVID posed an unprecedented challenge for prison officials. Yet DeMatteis's Department began implementing COVID precautions as early as January 2020 and kept honing its response through the end of her tenure.

Pushing back, the prisoners point to Sussex's quarantine procedures as an example. D.I. 712, at 9. Specifically, they note Sussex's practice of putting all "COVID-positive inmates into" a single overcrowded building. *Id.* But they never

8

plead facts that show this response was unreasonable. Were there other, empty buildings available for COVID patients? Did other prisons in Delaware create new facilities for overflow, suggesting that Sussex could have too? Without more, having overcrowded quarantine centers during the pandemic's peak was not unreasonable.

Next, the prisoners point to the Department's policy of charging prisoners for sick calls and medical-grade masks. D.I. 712, at 10. But again, they never plead facts showing that this practice is unreasonable under the Eighth Amendment. Were prisoners denied treatment if they could not pay? Was the $4 sick-call fee more than most could afford?

Finally, the prisoners say DeMatteis was "aware of … officers' intentional refusal to properly wear masks," yet did nothing about it. D.I. 695 ¶ 53. But they plead no facts that make this claim plausible. They say only that prisoners "sought to have the officers wear the masks properly," but do not explain how they did that. *Id.* ¶ 52. DeMatteis ran the state's whole prison system. I cannot assume that she knew about some unspecified amount of rogue conduct at one prison. Thus, I dismiss the claim against DeMatteis without prejudice.

ii. *Commissioner Hudson responded reasonably too.* Hudson replaced DeMatteis in 2021, and the prisoners allege little from his time as Commissioner. They say only that the Department provides cloth masks yet sells surgical ones and has failed to "require certain COVID-19-related trainings, and … provide adequate soap/sanitizer/cleaning stations." *Id.* ¶¶ 75, 77–78. And they note that Sussex personnel have ignored some COVID-safety suggestions from prisoners. *Id.* ¶ 76.

Without more, I cannot say that these measures were unreasonable. Take masks. The prisoners say nothing of other facts that would make the lack of free surgical masks unreasonable: for instance, the current infection rate, the cost of the surgical masks, or any medical sources saying such masks are necessary (rather than suggested) in these circumstances. Nor do they explain what trainings the Department should have offered. And they plead no facts to show that the Department currently provides insufficient cleaning supplies, much less that those are necessary to fight COVID. Finally, they fail to explain what prisoner suggestions Sussex ignored. So I dismiss their claim against Hudson without prejudice.

iii. *Governor Carney responded reasonably as well.* The Governor responded reasonably for the same reason as the Commissioners: his Department of Correction responded quickly and vigorously to the pandemic.

The prisoners allege that Governor Carney knew prison guards were violating the mask mandate. *Id.* ¶ 53. If true, then Governor Carney might have needed to do more to enforce that policy. After all, what counts as a "reasonable measure" naturally depends on what the official knew. But the prisoners fail to plead any facts to support their bald assertion that Governor Carney knew of these enforcement problems. Without some facts to support the Governor's subjective knowledge, I cannot conclude that he plausibly knew about the behavior of some prison guards at one prison. Because, on the facts pleaded, the Governor's response was reasonable, I dismiss the claim against him without prejudice.

10

iv. *Warden Mears was deliberately indifferent.* Most of Warden Mears's COVID response was reasonable, but there are two key differences. First, Mears likely knew that prison staff were defying the mask mandate: He oversaw day-to-day operations at Sussex prison. D.I. 695 ¶ 19. Plus, prisoners complained. *Id.* ¶ 52. So at this early stage, one can plausibly infer that he knew. Given that, he unreasonably failed to intervene to enforce the mandate. Second, at least one of the prisoners under his care was punished for fashioning and wearing a makeshift mask. Forbidding prisoners to protect themselves against COVID may well have been unreasonable as well.

### 2. Personal involvement

Since the prisoners' claim against Warden Mears passes the Eighth Amendment hurdle, I turn next to Mears's personal involvement. Under § 1983, they must adequately plead that Warden Mears was personally involved in the Eighth Amendment violation. *Chavarriaga*, 806 F.3d at 222. To meet this bar, the prisoners need allege only that Warden Mears had "actual knowledge of and acquiescence in the wrongful conduct." *Id.* He does.

The prisoners pleaded that Mears oversaw the prison. D.I. 695 ¶ 19. Plus, they say, prisoners complained to staff. *Id.* ¶ 52. And they claim that staff brazenly violated the mandate by hanging masks off their "breast-pocket button or a belt loop." *Id.* ¶ 51. Accepting these allegations as true, I find it plausible to infer that Mears knew of and acquiesced in the officers' defiance. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plus, it is likely that Mears knew prisoners were being punished for making and wearing their own masks. So the prisoners' claims against Mears may proceed.

11

\* \* \* \* \*

Because the Eleventh Amendment bars the prisoners' claims against the Delaware Department of Correction and their state constitutional claims against all Defendants, I dismiss those claims with prejudice. I also dismiss with prejudice the prisoners' damages claims against the state officials in their official capacities. And I dismiss without prejudice the prisoners' claim for injunctive relief against DeMatteis, Hudson, and Carney: on the facts that they plead, those officials responded reasonably. But the prisoners have plausibly alleged that Warden Mears knew of the serious COVID risk yet was deliberately indifferent to it. So the claim against him for injunctive relief may proceed.